OOSTBURG STATE BANK, Plaintiff-Respondent,

v.

UNITED SAVINGS & LOAN ASSOCIATION,
Defendant-Appellant,

AUTO OWNERS INSURANCE COMPANY,† Defendant.

Court of Appeals

*No. 84–472   Argued December 18, 1984.—Decided June 5, 1985.*
(Also reported in 372 N.W.2d 471.)

† Petition to review granted.

For the defendant-appellant, there were briefs by *Edward A. Dudek, Thomas J. Arenz* and *Michael J. Lund* of *Frisch, Dudek and Slattery, Ltd.*, of Milwaukee. Oral argument by *Edward A. Dudek*.

For the plaintiff-respondent, there was a brief by *James O. Conway* and *Arthur J. Olsen* of *Chase, Olsen, Kloet & Gunderson*, of Sheboygan. Oral argument by *Arthur J. Olsen*.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J.   United Savings & Loan Association (United) appeals from a default judgment in favor of the Oostburg State Bank (Oostburg) in the total amount of $307,214.03. United also appeals from the trial court's memorandum decision of March 16, 1984 and ensuing order of March 29, 1984 which denied United's motions to extend the time in which to answer, to grant relief from the judgment previously granted and for reconsideration of the previous order granting a default judgment to Oostburg.

We conclude United served and filed its answer within the time limits prescribed by Oostburg in a letter terminating a "courtesy agreement" which had extended the time for answer. Therefore, the default judgment was inappropriate. Accordingly, we reverse and remand for further proceedings.

Alternatively, we conclude that even if United was in default under the "courtesy agreement," the trial court abused its discretion in awarding the default judgment to Oostburg under the facts of this case.

On September 29, 1983, Oostburg served United with a summons and complaint claiming damages in the amount of $302,817.15.[1] The summons and complaint were executed on behalf of Oostburg by Attorney James Conway of the law firm of Chase, Olsen, Kloet and Gunderson.

On October 12, 1983, Attorney Thomas Klug of the law firm of Borgelt, Powell, Peterson and Frauen, S.C., telephoned Attorney Conway and advised him that the Borgelt firm had been retained by United. Klug requested an extension of time in which to answer. Conway agreed. Klug confirmed this understanding the next day by sending Conway a copy of a letter sent to the Sheboygan county clerk of courts enclosing Klug's notice of appearance. The Conway copy of the letter carried the following language:

---

[1] The complaint alleges a check-kiting scheme in which United issued four checks to Eggebeen Builders, Inc. in the total amount of $315,000. The checks were drawn on United's checking account at the Citizens Bank of Sheboygan. Eggebeen deposited the checks in its checking account at Oostburg. Oostburg accepted the checks in good faith and without notice of any defense against payment, dishonor, overdue status or claim by any other person. Oostburg allowed Eggebeen to draw against the checks prior to their being collected. Oostburg presented the checks to Citizens Bank for payment. The checks were not paid by Citizens because United had previously issued a stop-pay order. Oostburg set off against its loss those funds of Eggebeen then in its possession, resulting in the claimed damages of $302,817.15.

BPS: Mr. James O. Conway

> Dear Jim: We are in the process of preparing a responsive pleading to the Complaint in this matter. This will confirm our telephone conversation of October 12, 1983 at which time you were gracious enough to grant us a brief extension of time in which to responsively plead.

Attorney Steven Mocarski of the Borgelt firm appeared for United at an intervenor motion hearing brought by Auto-Owners Insurance Company on November 30, 1983. Conway appeared on behalf of Oostburg. At this hearing, Conway requested Mocarski to see to the filing of the answer as soon as possible.

Next, Conway wrote to Mocarski on December 6, 1983, transmitting various documents related to the case. Conway also stated:

As discussed, I would appreciate receiving a copy of your answer as soon as possible.

On December 15, 1983, Conway telephoned Mocarski and requested that the answer be filed as soon as possible.

Finally, on December 21, 1983, Conway again wrote to Klug and Morcarski reciting the procedural history of the case and complaining about the absence of an answer. The letter's critical language is as follows:

I will be compelled to move the Court for entry of a Default Judgment unless I receive your Answer within ten (10) days.

Although this letter was mailed on December 21, 1983, United submitted affidavits reciting that it was not received at the Borgelt firm until December 27, 1983. No evidence refutes this contention.

On January 3, 1984, Conway served and filed a notice of motion and motion for default judgment, scheduling the hearing for January 11, 1984. Klug received this

motion on January 5, 1984. He served the answer upon Conway by mail the following day, January 6. Klug then had several telephone conversations with Conway's firm to discuss whether the hearing for default judgment was still necessary since the answer had been served and filed. Conway's firm, however, refused to withdraw the motion.

At the January 11, 1984 default judgment motion hearing, Klug did not present a formal written motion for an enlargement of time to answer; nor did he expressly make such a verbal request to the trial court. He did, however, point out that an answer had been filed, and he explained the reasons for the delay. By bench decision, the trial court found United in default and also determined that United had not demonstrated excusable neglect.

The same day, following the default judgment motion, Klug filed written motions for a reconsideration of the bench decision and for an extension of time to answer. Thereafter, Attorney Edward Dudek of the law firm of Frisch, Dudek and Slattery, Ltd., filed a further notice of retainer and appearance on behalf of United. He also filed motions for reconsideration and enlargement of time within which to answer. In addition, Attorney Dudek filed a motion for relief from judgment pursuant to sec. 806.07, Stats.

The trial court conducted a hearing on February 15, 1984, on all of United's motions. On March 16, 1984, the trial court issued its written decision confirming its earlier rulings and denying United's motions.[2]

---

[2] Although the decision denies the motion for reconsideration, our examination of the transcript of the proceedings of February 15, 1984 and the trial court's decision of March 16, 1984 reveals, in fact, a full reconsideration of all issues bearing upon the default judgment request.

## I. The Status of the Professional Courtesy Agreement

### A. The Parties Were Bound by the "Courtesy Agreement"

We first consider whether a professional "courtesy agreement" must be placed on the court record in order to be binding upon the parties. The trial court indicated that when such courtesies are extended, sec. 807.05, Stats., requires that the trial court be advised and approve the agreement in order for it to be valid.[3] We disagree and conclude that under sec. 807.05, a courtesy agreement is binding even though it is not placed on the court record if the agreement is in writing and subscribed by the party to be bound.

Attorneys Klug and Conway entered into a courtesy agreement granting United a "brief extension of time in which to responsively plead." Although this agreement was not placed upon the court record, the written correspondence between the attorneys memorialized the agreement.

We note that courtesy agreements which extend time beyond the statutory limits in procedural matters are commonplace. Our supreme court has commented that "[t]his practice is common and is not to be condemned . . . ." *Giese v. Giese,* 43 Wis. 2d 456, 462, 168 N.W.2d 832, 835 (1969).

Whether an agreement or stipulation is binding is governed by sec. 807.05, Stats.:

**Stipulations.** No agreement, stipulation, or consent between the parties or their attorneys, in respect to the proceedings in an action or special proceeding shall be

---

[3] Although the trial court's ultimate rulings do not appear to be directly linked to the language of sec. 807.05, Stats., we nonetheless address them here.

binding unless made in court and entered in the minutes or recorded by the reporter or made in writing and subscribed by the party to be bound thereby or the party's attorney.

We disagree with the trial court's conclusion that the parties to the agreement or stipulation must make the agreement in court, place it upon the record or otherwise give the trial court notice thereof. Rather, we read sec. 807.05 to permit alternate methods to ensure that such agreements are enforceable: they must be "made in court and entered in the minutes or recorded by the reporter;" *or* they must be "made in writing and subscribed by the party to be bound." *Id.*

■ Statutory construction involves a question of law. *In re I.V.*, 109 Wis. 2d 407, 409, 326 N.W.2d 127, 128 (Ct. App. 1982). On review, an appellate court need not defer to the trial court's conclusions. *Id.*

■ The supreme court in *Wilharms v. Wilharms*, 93 Wis. 2d 671, 675, 287 N.W.2d 779, 782 (1980), indicated that the procedures recited in sec. 807.05, Stats., are alternate methods, rather than mandatory collective ones, for memorializing an agreement or stipulation:

This provision is explicit and requires that in order for any agreement or stipulation between the parties to be binding it must be made in court and entered in the minutes; recorded by the court reporter; *or made in writing and subscribed by the party or the party's attorney who is to be bound.* [Emphasis added.]

Section 807.05, Stats., is in the nature of a statute of frauds. *See Gliniecki v. Borden, Inc.*, 444 F. Supp. 619, 621 (E.D. Wis. 1978); 2 *Wisconsin Pleading & Practice* § 18.04 (3d ed. 1977). The rule seeks to prevent disputes and uncertainties as to what was agreed upon. *Burnham v. Smith*, 11 Wis. 258, 259 (1860); *see also* 2 *Wisconsin*

*Pleading & Practice* at § 18.04. Use of either of the alternative methods under the statute accomplishes this purpose. Therefore, the failure of the parties to place the stipulation upon the record or enter it in the court minutes does not defeat its enforceability since it was reflected in the totality of the writings between the attorneys and subscribed by them.[4]

Furthermore, we note that aside from the operation of sec. 807.05, Stats., the parties to a courtesy agreement have an ethical obligation to abide by their agreement:

This section is based on subsection 269.46(2). The only change in the former rule is the addition of the words "or recorded by the reporter." Requiring a minutes entry when an oral stipulation is recorded by the court reporter is duplicative and has been held by the Wisconsin Supreme Court to be unnecessary. *It should be emphasized that this statute in no way diminishes counsel's ethical obligation to abide by all oral and off-the-record stipulations.* [Emphasis added; footnotes omitted.]

Graczyk, *The New Wisconsin Rules of Civil Procedure Chapters 805–807*, 59 Marq. L. Rev. 671, 738–39 (1976). In addition, SCR 20.34(3)(t) (1984) states in pertinent part:

A lawyer should be courteous to opposing counsel and should accede to reasonable requests regarding court proceedings, settings, continuances, waiver of procedural formalities and similar matters which do not prejudice the rights of his or her client.

The procedure utilized in this case not only complied with the basic requirements of sec. 807.05, Stats., but also

---

[4] We do not hold that the trial court loses its inherent authority to terminate such an agreement on its own motion or to require an answer at an earlier point in time. We only hold that such an agreement cannot be voided on the grounds that the parties did not notify the court of the agreement's existence.

served the ethical considerations and goals of the supreme court rule.

### B.   Construction of the Courtesy Agreement

Having concluded that the procedure utilized by Klug and Conway complied with sec. 807.05, Stats., and therefore that the agreement was enforceable and binding upon the parties, we now turn to the construction of the agreement itself. Although the agreement fixed no termination date, we conclude that Conway gave reasonable notice to Klug of Conway's intent to terminate the agreement.

The agreement between Conway and Klug was to give Klug a "brief" extension of time in which to answer Oostburg's complaint. Ordinarily, an answer must be served within twenty days of the service of the complaint. Sec. 802.06(1), Stats. Before the expiration of this twenty-day period, Conway and Klug agreed to an extension of the statutory time limits. The agreement, however, was open-ended, with no self-executing termination date.[5] The trial court stated that Conway had no obligation to send a termination letter to Klug giving him reasonable notice of termination. We disagree. Having made an agreement with an indefinite expiration date, we conclude that Conway could terminate the agreement only by giving reasonable notice of such an intent.

We turn to contract law on this question. If a contract is silent as to duration, then either party may terminate it by giving reasonable notice to the other party of the

---

[5] This is a prominent fact which sets this case off from *State v. Omernick*, 14 Wis. 2d 285, 111 N.W.2d 135 (1961), and *Eble v. Criterion Insurance Co.*, 310 A.2d 418 (Pa. 1973), in which *specific* deadlines were fixed by which an answer was to be served. United's reliance on these cases is therefore misplaced.

intent to terminate. *See California Wine Association v. Wisconsin Liquor Co.,* 20 Wis. 2d 110, 124–25, 121 N.W. 2d 308, 316 (1963); *City of Milwaukee v. City of West Allis,* 217 Wis. 614, 618, 258 N.W. 852 (1935). We find this principle applicable here.[6]

Conway properly gave Klug notice of his intent to terminate the courtesy agreement when he advised Klug in the December 21 letter:

I will be compelled to move the Court for entry of a Default Judgment unless I receive your Answer within ten (10) days.

We agree with the trial court's conclusion that ten days was a reasonable notice of termination under the facts of this case.

We emphasize that although we have turned to a principle of contract law to determine that Conway was required to give a reasonable notice of termination, we do not elevate professional courtesy agreements to the level of formal contracts. One court has observed that engrafting the rules of contract interpretation onto these agreements is undesirable:

It is important to be careful with the language of one's agreements, but to apply a rule approaching strictissmi

---

[6] We acknowledge another rule of contract law which imposes a reasonable time of duration upon an agreement which is indefinite as to its term. *Amoco Oil Co. v. Capitol Indemnity Corp.,* 95 Wis. 2d 530, 551, 291 N.W.2d 883, 894 (Ct. App. 1980). However, because we are not elevating professional courtesy agreements to the level of formal contracts, we are not obliged to apply all principles of contract construction to attorney courtesy agreements. Rather, we seek to adopt only those principles which are truly practical and which meet the day-to-day needs of the practicing attorney. Attempting to determine what is a "reasonable" duration of a courtesy agreement which expresses no specific term invites confusion and misunderstanding. We conclude the more practical approach is to adopt the rule which gives either attorney the right to terminate such agreement.

juris ["of the strictest right or law"] to lawyers' daily contacts inter sese ["among themselves"] would be unfortunate quite apart from and far beyond the result reached in this particular case.

*Sea-Land Service, Inc. v. R.V. D'Alfonso Co.*, 727 F.2d 1, 4 (1st Cir. 1984). We agree with this observation.

### C. Klug Complied With the Termination Notice

Having concluded that Conway gave Klug reasonable notice of his intent to terminate, we now consider whether Klug met the time limit established in Conway's letter. We conclude that Klug served the answer within the ten-day limit recited in the letter.

Conway sent the termination letter on December 21, 1983. The only evidence before the trial court as to receipt of the letter was that Klug's law firm received the letter on December 27.

The parties disagree as to whether the ten-day period began running on December 21, the date the letter was mailed, or on December 28, the day after the letter was received. The trial court began counting on the day after the letter was sent. As we noted previously, the letter stated that Conway would move for default judgment "unless I receive your Answer within ten (10) days." The letter is silent as to when the ten-day period was to begin.

Where a party sends notice terminating a contract, the period of notice begins to run from receipt of the notice, not from the mailing of the notice, unless the contract clearly specifies otherwise. *See Oldfield v. Chevrolet Motor Co.*, 199 N.W. 161, 162 (Iowa 1924). We find this general principle applicable to a notice terminating an open-ended courtesy agreement. In addition, sec. 801.15(1), Stats., provides that in computing any period of time prescribed or allowed by chs. 801 to

847, "the day of the act, event or default from which the designated period of time begins to run shall not be included." We conclude, therefore, that Klug had ten days *after* the receipt of the termination letter in which to answer Conway's complaint. The trial court erred by holding that the ten-day period began to run on the day after the letter was sent.

As to the actual day-counting, we rely on sec. 801.15 (1), Stats., as did the trial court. Affidavits by United indicate that the letter was received on December 27, and no evidence refutes this claim. As noted above, the ten-day period did not begin to run until the day after Klug received the termination letter. The first day of the ten-day period, therefore, was December 28. Klug's answer was served upon Conway by mail on January 6, 1984. Service by mail is complete upon mailing. Sec. 801.14(2), Stats. January 6 was the tenth day of the period allowed by the termination letter. Klug therefore served the answer within the time limits prescribed by Conway in the termination letter.

Based on the foregoing analysis, United was not in default. The trial court erroneously concluded that the agreement between the attorneys was not enforceable and that the ten-day period before termination of the agreement began running on the day after the letter was sent. We reverse the trial court's decision, vacate the default judgment and remand for further proceedings upon all the pleadings.

D. Regardless of the Time Computations, the Trial Court Abused its Discretion by Granting Default Judgment

Even if our computations are erroneous and Klug did not meet the time limits prescribed in the termination

letter, we conclude that the trial court abused its discretion by finding inexcusable neglect and granting default judgment.

Whether to grant a default judgment is within the discretion of the trial court. *Martin v. Griffin,* 117 Wis. 2d 438, 442, 344 N.W.2d 206, 209 (Ct. App. 1984). The trial court should bear in mind that default judgments are viewed with disfavor. *Id.* This exercise of discretion requires a record of the trial court's reasoned application of the appropriate legal standards to the facts of the case. *Id.*

The supreme court's decision in *Hedtcke v. Sentry Insurance Co.,* 109 Wis. 2d 461, 326 N.W.2d 727 (1982), sets forth the procedure to be applied by the trial court when addressing a motion for default judgment and a concomitant motion for enlargement of time within which to responsively plead. Section 801.15(2)(a), Stats., grants the circuit court the power to enlarge the time for serving an answer.[7] The circuit court may grant relief under sec. 801.15(2)(a) if it finds reasonable grounds for noncompliance with the statutory time period (excusable neglect) and if an enlargement of time would serve the interests of justice. *Hedtcke* at 468, 326 N.W.2d at 731. Whether a motion for enlargement should be granted falls within the discretion of the trial court. *Id.* at 467, 326 N.W.2d at 730.

---

[7] Section 801.15(2)(a), Stats., provides:

When an act is required to be done at or within a specified time, the court may order the period enlarged but only on motion for cause shown and upon just terms. The 60 day period under s. 801.02 may not be enlarged. If the motion is made after the expiration of the specified time, it shall not be granted unless the court finds that the failure to act was the result of excusable neglect. The order of enlargement shall recite by its terms or by reference to an affidavit in the record the grounds for granting the motion.

The trial court must first determine whether the failure to meet the statutory time limits was the result of excusable neglect. Here, the historical facts surrounding this question are undisputed. In such a case, the application of the rules of law to such facts presents a question of law. *Compton v. Shopko Stores, Inc.*, 93 Wis. 2d 613, 616, 287 N.W.2d 720, 721 (1980). " 'Excusable neglect' is that neglect which might have been the act of a reasonably prudent person under the same circumstances." *Giese*, 43 Wis. 2d at 461, 168 N.W.2d at 834 (footnote omitted). "Excusable neglect is not synonymous with neglect, carelessness, or inattentiveness." *Id.*

The issue is the effect, if any, of a courtesy agreement which extends the time within which to responsively plead on the claim of excusable neglect when the agreement covers a portion of the default period.[8] This requires consideration of the following language of the supreme court in *Giese:*

The trial court, as well as the members of this court, are well aware of the courtesies between members of the bar in the extension of time beyond the statutory limits in procedural matters. This practice is common and is not to be condemned; *however, to constitute the basis for excusable neglect there must be an agreement or consent, preferably in writing or at least orally.* [Emphasis added; footnote omitted.]

*Id.* at 462, 168 N.W.2d at 835.

We read this language in *Giese* to hold that where a courtesy agreement is in effect, the failure to meet statutory time limits is excusable neglect. In other words, when an attorney reasonably relies on a courtesy agreement extending statutory time limits, such reliance

---

[8] We certified this question to the Wisconsin Supreme Court on February 6, 1985. Certification was denied, however, on March 5, 1985.

should not form the basis for a finding of inexcusable neglect. Therefore, when considering a claim of excusable neglect, the trial court may not consider attorney conduct, even if dilatory, which occurred when a courtesy agreement was in place. The trial court may only look to the period of time after the courtesy agreement expires.

Therefore under the facts of this case, the only time period applicable to the claim of excusable neglect was minimal: from the termination of the courtesy agreement, which at the earliest was January 3,[9] to the date the answer was served, January 6. At the very most, therefore, a three-day delinquency existed.

As we noted earlier, excusable neglect is neglect which might have been the act of a reasonably prudent person under the same circumstances. *Giese* at 461, 168 N.W.2d at 834. Prompt remedial action by the dilatory party is also a factor to consider in determining whether excusable neglect exists. *Hedtcke* at 475–76, 326 N.W.2d at 734.

We have already concluded that Klug timely complied with the termination notice. From this we also conclude that it was reasonable for Klug to assume, upon receiving the termination letter, that he had until January 6 to serve the answer. In any event, his prompt remedial action in serving the answer a mere three days after the January 3 deadline (assuming it controls) was not unreasonable.

Because the trial court considered Klug's actions during the period of time in which the courtesy agreement was in place, it erred in concluding that Klug failed to demonstrate excusable neglect. By applying an inappro-

[9] To arrive at this date, one would have to begin counting on the day after the letter was sent and allow for the three days required by sec. 801.15(5), Stats.

priate legal standard, the trial court abused its discretion. *See Martin,* 117 Wis. 2d at 442, 344 N.W.2d at 209.[10]

In addition to considering whether excusable neglect is demonstrated, the trial court must also consider whether the interests of justice would be served by granting the motion for enlargement of time. *Hedtcke* at 468, 326 N.W.2d at 731. The interests of justice require the circuit court to be aware of the effects of an order denying or granting relief. *Id.* at 469, 326 N.W.2d at 731. The circuit court must be cognizant that denial of a motion for enlargement of time to answer may result in a default judgment in favor of the plaintiff. *Id.* The trial court should consider that default judgments are viewed with disfavor and the law prefers to afford litigants a day in court and trial on the issues. *Dugenske v. Dugenske,* 80 Wis. 2d 64, 68, 257 N.W.2d 865, 867 (1977). Considering the interests of justice requires a determination of whether the dilatory party has demonstrated good faith and whether the other party has been prejudiced by the delay. *Hedtcke* at 468, 326 N.W.2d at 731. The trial court must also be concerned with the prompt adjudication of cases. *Id.* at 469, 326 N.W.2d at 731. Whether the dilatory party took prompt remedial action is a relevant factor. *Id.* at 477, 326 N.W.2d at 735.

The trial court's decision does not expressly address the questions of good faith on the part of Attorney Klug

[10] This conclusion supports the remand in this case. Standing alone, it would require further proceedings in the trial court for application of the correct excusable neglect standards and a further consideration of Oostburg's request for default judgment. However, in light of our earlier holding that United, nonetheless, timely filed its answer, further proceedings on remand need not address this issue.

and prejudice, if any, to Oostburg. However, even if the trial court had considered these factors in support of the default judgment, the granting of the judgment was inappropriate in light of the minimal default period, the prompt remedial action taken by Attorney Klug, and the significant impact of the judgment upon all concerned.[11]

*By the Court.*—Judgment and order reversed and cause remanded.

---

[11] Here also, our earlier holding that United timely filed its answer negates any need for further proceedings on this question upon remand.